### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN DIVISION

| | |
|---|---|
| FRANKLIN MONTENEGRO, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN NEIGHBORHOOD MORTGAGE ACCEPTANCE COMPANY d/b/a ANNIEMAC HOME MORTGAGE,<br><br>Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Franklin Montenegro, individually and on behalf of all others similarly situated ("Plaintiff"), by and through undersigned counsel, upon personal knowledge as to his own acts and experiences and, where indicated, upon information and good faith belief, brings this class action lawsuit against American Neighborhood Mortgage Acceptance Company, d/b/a AnnieMac Home Mortgage ("AnnieMac" or "Defendant") and alleges the following:

### NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit against American Neighborhood Mortgage Acceptance Company d/b/a AnnieMac Home Mortgage ("AnnieMac" or "Defendant") for its failure to properly secure and to safeguard Plaintiff's and other similarly situated individuals' sensitive personal information including, but to not limited to, their full names and Social Security numbers (collectively, "Personal Information" or "PII").

1

2.      AnnieMac is a nationwide mortgage loan provider that receives and maintains sensitive personal and financial information from its customers in connection with providing mortgage loan services.

3.      On or about November 14, 2024, AnnieMac filed an official notice (the "Notice") of a hacking incident with the Office of the Maine Attorney General.[1]

4.      According to that Notice, between August 21 and August 23, 2024, an unknown actor gained unauthorized access to AnnieMac's computer systems and network, viewing and/or copying files containing customers' Personal Information (the "Data Breach"). As a result, the sensitive Personal Information of approximately 171,000 current and former AnnieMac customers was compromised and exposed to unauthorized third parties[2].

5.      The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities and financial fraud and identity theft. Indeed, the entire purpose of these types of data breaches is to misuse the information and/or to sell it to fraudsters on the dark web. Consequently, all impacted individuals are at a heightened and significant risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

6.      As a result of Defendant's actions and, more fundamentally, inactions Plaintiff and Class Members were forced to undertake time-consuming—and often costly—efforts to mitigate the actual and potential harm caused by the Data Breach's exposure of their Personal Information,

---

[1]     *See Notice of Data Event* (November 14, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4e82f3bb-55b2-4dd5-bd97-86893bddd75d.html (last visited November 19, 2024).

[2] *AnnieMac Data Breach Impacts 171,000 Customers,* (November 18, 2024), https://nationalmortgageprofessional.com/news/anniemac-data-breach-impacts-171000-customerslast visited November 19, 2024).

including by, among other things, placing freezes and alerts with credit reporting agencies, contacting their financial institutions and health insurance providers, closing or modifying financial accounts, reviewing and monitoring their credit reports and accounts for unauthorized activity, changing passwords on potentially impacted websites and applications, and requesting and maintaining accurate records.

7.      Plaintiff and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes. As such, Plaintiff and Class Members bring this action to recover for the harm they suffered and assert the following claims: (i) Negligence, (ii) Negligence *per se*, (iii) Breach of Implied Contract, (iv) Unjust Enrichment and (v) Breach of Fiduciary Duty.

## PARTIES

8.      Plaintiff Franklin Montenegro is a natural person and citizen of New Jersey, who at all relevant times resided in Roselle, New Jersey.

9.      AnnieMac is a domestic limited liability company organized and existing under the laws of the State of New Jersey, which maintains its principal place of business at 700 East Gate Drive, Suite 400 in Mount Laurel, New Jersey 08054.

## JURISIDCTION AND VENUE

10.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. And the number of class members is approximately 171,000, many of whom have different citizenship from Defendant.

11.     This Court has personal jurisdiction over AnnieMac because it maintains its principal place of business within Burlington County, New Jersey, and conducts substantial business throughout this judicial district.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 110 because Defendant resides in this judicial district, maintains its principal place of business in this judicial district and a substantial part of the events giving rise to this action occurred herein.

<strong>COMMON FACTUAL ALLEGATIONS</strong>

**A.    Defendant Collected, Maintained and Stored Personal Information.**

13.     AnnieMac is a nationwide mortgage loan provider that receives, maintains, and stores large volumes of sensitive personal and financial information from its customers in connection with providing mortgage loan services.[3]

14.     As a condition of receiving mortgage services from AnnieMac, customers are required to provide their personal information including, but not limited to, their names and Social Security numbers.

15.     By collecting and storing this information, AnnieMac assumes a duty to securely maintain and protect its customers' Personal Information.

16.     AnnieMac acknowledges on its own website and in communications with customers that "confidentiality, privacy, and security of personal information within our care are among AnnieMac's highest priorities."[4]

---

[3]     *Annie    Mac,*    https://singlefamily.fanniemae.com/originating-underwriting/mortgage-products/homestyle-renovation-mortgage/anniemac (last visited November 19, 2024).

[4] Notice of Data Event, *supra*, at 2.

17.    Plaintiff and Class Members relied on AnnieMac to implement and maintain reasonable and adequate security measures to keep their Personal Information secure and protected from unauthorized access.

**B.    Defendant's Data Breach Exposed Customers' Personal Information.**

18.    Between August 21 and August 23, 2024, an unknown actor gained unauthorized access to AnnieMac's computer systems and network. During this period, the unauthorized actor viewed and/or copied files containing customers' Personal Information from AnnieMac's systems.[5]

19.    In its Notice, AnnieMac represents that it discovered the unauthorized access on August 23, 2024.

20.    The Data Breach resulted in the compromise and exposure of Personal Information belonging to approximately 171,000 current and former AnnieMac customers.

21.    Defendant's Notice is woefully inadequate as it does not provide any information regarding the cybercriminals behind the Data Breach, what specific steps Defendant has taken to prevent such incidents in the future or provide Plaintiff and Class Members with any identity monitoring and/or fraud protection services.

22.    Remarkably, Defendant put the burden on Plaintiff and Class Members to take measures to protect themselves, advising them "remain vigilant by reviewing your account statements and credit reports closely."[6]

23.    Given that Defendant was storing the Personal Information of Plaintiff and Class Members and knew or should have known of the serious risk and harm caused by a data breach,

---

[5] *Id.*

[6] *Id.*

Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission and promoted by data security experts and other agencies. That obligation stems from the foreseeable risk of a Data Breach given that Defendant collected, stored, and had access to a swath of highly sensitive customer and employee records and data and, additionally, because other highly publicized data breaches at numerous institutions put Defendant on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

24.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

25.     Despite the abundance and availability of information regarding cybersecurity best practices for the financial industry and the prevalence of financial data breaches, Defendant inexplicably failed to adopt sufficient data security process by, without limitation:

a.     Failing to properly select its information security partners;

b.     Failing to ensure the proper monitoring and logging of the ingress and egress of network traffic;

c.     Failing to ensure the proper monitoring and logging of file access and modifications;

d.     Failing to ensure the proper training its and its technology partners' employees as to cybersecurity best practices;

e.     Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and class Members;

f.     Failure to timely and accurately that Plaintiff's and Class Members' PII had been improperly acquired or accessed;

g.     Knowingly disregarding standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and

h.     Failing to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and

6

misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and potentially disclose it to others without consent.

26.     Additionally, and upon information and good faith belief, Defendant failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' Personal Information, and to monitor user behavior and activity to identify possible threats.

27.     Time is of the essence when highly sensitive PII is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted, PII to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PII onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

28.     Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored and the prevalence of financial data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the Personal Information of Plaintiff and Class Members from being compromised. The Data Breach itself, and information Defendant has disclosed about the breach to date, including its length, the need to remediate Defendant's cybersecurity, the number of people impacted, and the sensitive nature of the impacted data collectively demonstrate Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the Personal Information it oversaw.

**C.    Defendant Failed to Comply with FTC Guidelines.**

29.    The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[7]

30.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

31.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for business. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[8]

32.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

---

[7] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last viewed Oct. 25, 2024).

[8] *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last viewed Oct. 25, 2024).

on the network; and verify that third-party service providers have implemented reasonable security measures.[9]

33.    The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require:

(1) Encrypting the information stored on computer networks;

(2) Retaining payment card information only as long as necessary;

(3) Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

(4) Limiting administrative access to business systems

(5) Using industry unapproved activity;

(6) Monitoring activity on networks to uncover unapproved activity;

(7) Verifying that privacy and security features function properly;

(8) Testing for common vulnerabilities; and

(9) Updating and patching third-party software.[10]

34.    The FTC cautions businesses that failure to protect Personal Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[11] Indeed, the FTC treats the failure to

---

[9]    *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last viewed Oct.. 25, 2024).

[10] *Id.*

[11] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last viewed Oct. 25, 2024).

implement reasonable and adequate data security measures-like Defendant failed to do here-as an unfair act prohibited by Section 5(a) of the FTC Act.

35.     The FTC has brough enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act of practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

36.     These FTC enforcement actions include actions against financial firms and partners like Defendant.

37.     Defendant failed to properly implement basic data security practices.

38.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

39.     Defendant was at all times fully aware of the obligation to protect the Personal Information of customers, customers, and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**D.     Defendant Failed to Comply with Industry Standards.**

40.     As shown above, experts studying cybersecurity routinely identify financial providers as being particularly vulnerable to cyberattacks because of the value of the Personal Information which they collect and maintain.

41.     Several best practices have been identified that at a minimum should be implemented by financial firms like Defendant, including but not limited to educating all

10

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and ant-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limited which employees can access sensitive data.

42.    The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

43.    Other best cybersecurity practices that are standard in the financial industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

44.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[12] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

---

[12] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last accessed Oct. 25, 2024).

Internet's Critical Security Controls[13] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

45.     The FBI's Internet Crime Complaint (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

46.     These foregoing frameworks are existing and applicable industry standards in the financial industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**E.     The Data Breach Resulted from AnnieMac's Failure to Properly Maintain and Safeguard its Systems and Data.**

47.     Defendant breached its obligation to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

      a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

      b.  Failing to adequately protect customers' Personal Information;

      c.  Failing to properly monitor its own data security systems for existing intrusions;

      d.  Failing to ensure that its vendors with access to its computer systems and employed reasonable security procedures;

      e.  Failing to detect unauthorized ingress into its systems;

---

[13] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list (last visited Oct. 25, 2024).

     f.    Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

     g.   Failing to detect unauthorized exfiltration of the most sensitive data on its system;

     h.   Failing to train its employees in the proper handling of emails containing Personal Information and maintain adequate email security practices;

     i.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and

     j.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Personal Information.

48.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Personal Information.

49.    Accordingly, as outlined below, Plaintiff and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiff and Class Members lost the benefit of the bargain they made with Defendant.

**F.   Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.**

50.    Cyberattacks and data breaches at financial firms like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

51.    The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[14]

---

[14] See GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

52.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identify thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names.

53.     Because a person's identity is akin to a puzzle, the more accurate piece of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

54.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique called "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

55.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steal their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[15]

56.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[15] *See IdentityTheft.gov/Steps,* https://www.identitytheft.gov/steps (last visited May 30, 2024).

57.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

58.     In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an issued victim's name.

59.     Moreover, theft of Personal Information is also gravely serious because Personal Information is an extremely valuable property right.[16]

60.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Personal Information has considerable market value.

61.     There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when Personal Information and/or financial information is stolen and when it is used.

62.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[16] *See, e.g.,* John T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

63.    Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

64.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

65.    Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

66.    Personal Information can sell for as much as $363 per record according to the Infosec Institute.[18]

67.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[19] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[20] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number

---

[17] *The GAO Report*, *supra*, n.15.

[18] Ashiq Ja, *Hackers Selling Financial Data in the Black Market*, Infosec (July 27, 2015), https://www.resources.infosecinstitute.com/topic/hackers-selling-financial-data-in-the-black-market (last viewed May 31, 2024).

[19] *Identity Theft and Your Social Security Number* (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 31, 2024).

[20] *Id.* at 4.

was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

68.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

69.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

70.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

71.     Because of the value of the information it held, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[21] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identtiy-theft (last visited May 31, 2024).

[22] Time Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 31, 2024).

G.    **Plaintiff's and Class Members' Damages.**

72.    Plaintiff and Class Members have been damaged by the compromise of their Personal Information in the Data Breach.

73.    Plaintiff's and Class Members' Personal Information was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held within its systems. The Personal Information exposed included the names, addresses, dates of birth, Social Security Numbers, financial account information, and other sensitive financial formation for current and former clients of Defendant.[23]

74.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

75.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

76.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

77.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

---

[23] Notice of Data Breach, *supra*, n.1.

78.     Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

79.     Plaintiff and Class Members also suffered a loss of value of their Personal Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

80.     Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are current or former customers of Defendant overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards. Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiff's and Class Members' Personal Information.

81.     As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members who are current or former customers of Defendant did not get what they paid for and agreed to.

82.     Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

     a.  Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

     b.  Purchasing credit monitoring and identity theft prevention;

     c.  Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, financial providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring their bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for years to come.

83.     Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Personal Information is not accessible online or otherwise to unauthorized third parties.

84.     Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Personal Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

85.     As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCES

86.     Plaintiff Frank Montenegro is and at all times mentioned herein was a resident of New Jersey, residing in the city of Roselle, New Jersey.

87.     As a condition of receiving services, Defendant required Plaintiff Montenegro to provide his Personal Information.

88.     Plaintiff Montenegro provided his Personal Information in order to receive mortgage services from AnnieMac.

89.     In November 2024, Plaintiff Montenegro received a Notice of Data Breach from Defendant, which informed him of the Data Breach and that he faced a substantial and significant risk of his Personal Information being misused.

90.     The Notice informed Plaintiff that his Personal Information, including his Social Security number, had been improperly accessed and/or obtained by unauthorized third parties. The Notice indicated that Plaintiff's Personal Information was compromised as a result of the Data Breach.

91.     Plaintiff Montenegro reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard his Personal Information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to the same. Plaintiff Montenegro would not have used Defendant's services had he known that Defendant would not take reasonable steps to safeguard his Personal Information.

92.     Plaintiff Montenegro is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Montenegro stores any documents containing his Personal Information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

93.     As a result of the Data Breach and at the recommendation of Defendant and its Notice, Plaintiff Montenegro made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial statements, monitoring his credit information, and changing passwords on his various accounts.

94.     Plaintiff Montenegro has spent significant time responding to the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation.

95.     Plaintiff Montenegro suffered actual injury from having his Personal Information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) entrusting PII to Defendant that he would not have had Defendant disclosed it lacked data security practices adequate to safeguard its customers' Personal Information; (b) damages to and diminution in the value of his Personal Information–a form of intangible property that he entrusted to Defendant as a condition of receiving financial services; (c) loss of his privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of his mitigation efforts as a result of the Data Breach.

96.     Due to the Data Breach, Plaintiff Montenegro anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, monitoring his financial history and insurance information, and monitoring his other accounts for fraudulent activity.

97.     In addition, knowing that unauthorized actors accessed and/or stole his PII, which may be used for identity theft, fraud, and related purposes, has caused Plaintiff Montenegro to experience feelings of anxiety, stress, and fear. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

98.     Plaintiff Montenegro suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns

for the loss of his privacy, as well as anxiety over the impact of cybercriminals accessing and using his PII.

99.    Plaintiff Montenegro is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties/criminals.

100.    Plaintiff Montenegro has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated (the "Class").

102.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose PII was impacted by the Data Breach, including all persons to whom Defendant sent a notice of the Data Breach.

103.    The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

104.    Plaintiff reserves the right to amend or modify the Class or Subclass definitions as the case progresses.

105.    **Numerosity**: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

106.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

107.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff have no interests that conflict with, or are antagonistic to those of, the Class, and Defendant has no defenses unique to Plaintiff.

108.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

      a.    Whether Defendant violated the laws asserted herein, including statutory privacy laws;

b.   Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and members of the Class's Personal Information;

c.   Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and members of the Class's Personal Information;

d.   Whether Defendant breached its contractual promises to safeguard Plaintiff's and members of the Class's Personal Information;

e.   Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing Personal Information;

f.   Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and members of the Class's Personal Information from unauthorized release and disclosure;

g.   Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiff's and members of the Class's Personal Information from unauthorized release and disclosure;

h.   Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i.   Whether Defendant's method of informing Plaintiff and other members of the Class was unreasonable;

j.   Whether Defendant's conduct was likely to deceive the public;

k.   Whether Defendant is liable for negligence or gross negligence;

l.   Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the Personal Information violated applicable state laws;

m.   Whether Plaintiff and Class members were injured as a proximate cause or result of the Data Breach;

n.   Whether Plaintiff and members of the Class were damaged as a proximate cause of the Data Breach;

o.   Whether Defendant's practices and representations related to the Data Breach breached implied contracts with Plaintiff and members of the Class;

p.   What the proper measure of damages is and

q. Whether Plaintiff and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

109.    **Superiority**: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct.

110.    Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

111.    A class action is therefore superior to individual litigation because:

a. The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

112.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant failed to timely and adequately notify the public of the Data Breach;

    b.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

    c.    Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Personal Information; and

    f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

113.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (*On Behalf of Plaintiff & the Class*)

114.    Plaintiff realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

115.    Defendant required its customers and employees, including Plaintiff and Class Members, to submit their Personal Information to receive Defendant's services and/or obtain employment with Defendant.

116.    By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Personal Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

117.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the Personal Information.

118.    Plaintiff and the Class are a well-defined, foreseeable, and probable group of customers and employees that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

119.    A large repository of highly valuable financial and personal information is a foreseeable target for cybercriminals looking to steal and profit from that Personal Information. Defendant knew or should have known that, given its repository of a host of Personal Information for thousands of customers and/or employees posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiff's and Class Members' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Personal Information.

28

120.    After all, PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiff and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the Personal Information entrusted to them.

121.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its customers and/or employees, which is recognized by laws and regulations including but not limited to the FTC Act, as well as common law. Defendant was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

122.    In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[24]

123.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Personal Information.

124.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Personal Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Personal Information;

    b.    Failing to adequately monitor the security of its networks and systems;

    c.    Failing to have in place mitigation policies and procedures;

---

[24] *See* 15 U.S.C. § 45.

d.  Allowing unauthorized access to Plaintiff's and Class Members' Personal Information;

e.  Failing to detect in a timely manner that Plaintiff's and Class Members' Personal Information had been compromised and

f.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

125.    Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' Personal Information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches in the financial industry, and allowing unauthorized access to Plaintiff's and Class Members' Personal Information.

126.    The failure of Defendant to comply with industry standards and federal regulations evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information.

127.    But for Defendant's wrongful and negligent breach of its duties to Plaintiff and Class Members, their Personal Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the Personal Information of Plaintiff and Class Members and all resulting damages.

128.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Personal Information would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

129.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Personal Information would result in one or more types of injuries to Plaintiff and Class Members.

130.    As a result of this misconduct by Defendant, the Personal Information of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and of their Personal Information being disclosed to third parties without the consent of Plaintiff and the Class.

131.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

132.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

### COUNT II
### Negligence *per se*
### (*On Behalf of Plaintiff & the Class*)

133.    Plaintiff realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

134.    Plaintiff alleges this negligence *per se* theory as alternative to Count I.

135.    Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[25]

---

[25] *See* 15 U.S.C. § 45.

136.    Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

137.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

138.    Defendant owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their Personal Information. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach.

139.    This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the fallout of Defendant's Data Breach.

140.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendant actively sought and obtained the Personal Information of Plaintiff and Class Members.

141.    Defendant breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information. And but for Defendant's

negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts

and omissions committed by Defendant include, but are not limited to:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Personal Information;

    b.  Failing to comply with—and thus violating—FTCA and its regulations;

    c.  Failing to adequately monitor the security of its networks and systems;

    d.  Failing to have in place mitigation policies and procedures;

    e.  Allowing unauthorized access to Plaintiff's and Class Members' Personal Information;

    f.  Failing to detect in a timely manner that Plaintiff's and Class Members' Personal Information had been compromised; and

    g.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

142.    Defendant's failure to comply with applicable laws and regulations constitutes

negligence *per se*.

143.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff

and Class Members, Plaintiff and Class Members would not have been injured.

144.    The injury and harm suffered by Plaintiff and Class Members was the reasonably

foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that

it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class

Members to experience the foreseeable harms associated with the exposure of their Personal

Information.

145.    Simply put, Defendant's negligence actually and proximately caused Plaintiff and

Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not

limited to, the theft of their Personal Information by criminals, improper disclosure of their

Personal Information, lost benefit of their bargain, lost value of their Personal Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

146.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

147.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

**COUNT III**
**Breach of Implied Contract**
**(*On Behalf of Plaintiff & the Class*)**

148.    Plaintiff realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

149.    Defendant required Plaintiff and Class Members to provide and entrust their Personal Information as a condition of obtaining services from Defendant and/or obtaining employment with Defendant.

150.    Plaintiff and Class Members paid money to Defendant, directly and/or indirectly, in exchange for goods, services, and/or employment, as well as Defendant's promise to protect their Personal Information from unauthorized disclosure.

151.    Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the Personal Information confidentially and securely.

152.    Defendant had an implied duty of good faith to ensure that the Personal Information of Plaintiff and Class Members in its possession was used only as authorized, such as to provide mortgage services and other benefits from Defendant.

153.    Defendant had an implied duty to protect the Personal Information of Plaintiff and Class Members from unauthorized disclosure or uses.

154.    Additionally, Defendant implicitly promised to retain this Personal Information only under conditions that kept such information secure and confidential.

155.    Through its course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Personal Information.

156.    Defendant solicited and invited Plaintiff and Class Members to provide their Personal Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Personal Information to Defendant.

157.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential Personal Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Information for uses other than mortgage services, billing, and obtaining benefits from Defendant.

158.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' Personal Information; failing to

provide timely and accurate notice to Plaintiff and Class Members that their Personal Information was compromised as a result of the Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contract between Plaintiff, Class Members, and Defendant.

159.    Defendant's failures to meet these promises constitute breaches of the implied contracts.

160.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing goods and services to Plaintiff and Class Members that were of a diminished value.

161.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Personal Information in exchange for mortgage services and services and employment benefits.

162.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

163.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**COUNT IV**
**Unjust Enrichment**
(***On Behalf of Plaintiff & the Class***)

164.    Plaintiff realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

165.    This claim is pled solely in the alternative to Plaintiff's breach of implied contract claims.

166.    Plaintiff and Class Members conferred a monetary benefit on Defendant by paying money for financial services that relied on Defendant to render certain services, a portion of which was intended to have been used by Defendant for data security measures to secure Plaintiff and Class Members' Personal Information. Plaintiff and Class Members further conferred a benefit on Defendant by entrusting their Personal Information to Defendant from which Defendant derived profits.

167.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

168.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

169.    Defendant acquired the monetary benefit and PII through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

170.    If Plaintiff and Class Members knew that Defendant had not secured their Personal Information, they would not have agreed to give their money—or disclosed their data— to Defendant.

171.    Plaintiff and Class Members have no adequate remedy at law.

172.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their Personal Information is used; (3) the compromise, publication, and/or theft of their Personal Information; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Personal Information; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their Personal Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information in its possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

173.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles

for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

174.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

**COUNT V**
**Breach of Fiduciary Duty**
(**_On Behalf of Plaintiff & the Class_**)

175.    Plaintiff realleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

176.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Personal Information, Defendant became a fiduciary by its undertaking and guardianship of the Personal Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Personal Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

177.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its current and former customers and employees to keep secure their Personal Information.

178.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

179.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Personal Information.

180.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

181.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Personal Information.

182.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Personal Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

183.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Franklin Montenegro, individually and on behalf of all others similarly situated, respectfully requests that judgment be entered in his favor and against American Neighborhood Mortgage Acceptance Company, and further requests that this Honorable Court enter an order:

A.    certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.    granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Personal Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

D.    granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.    requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.    awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.    awarding punitive damages, as allowable by law;

H.    awarding attorneys' fees and costs under the common fund doctrine and any other applicable law;

I.    awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J.      Pre and post-judgment interest on any amounts awarded and

K.      All such other relief as is equitable and just.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 22, 2024

Respectfully submitted:

/s/_____
STARK & STARK, P.C. Bar No. 012602007
Stefanie Colella-Walsh, Esq.
100 American Metro Blvd
Telephone:609-895-7362
Fax: (609) 896-0629
E-mail: scolellawalsh@stark-stark.com
         masstorts@stark-stark.com


**ALMEIDA LAW GROUP LLC**
David S. Almeida (*pro hac vice*
forthcoming)
849 W. Webster Ave.
Chicago, Illinois, 60614
Tel.: (312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiff & the Class*

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Rule 11.2, the undersigned states and otherwise affirms that the matters put in controversy by the filing of this putative class action complaint—namely, an alleged data security incident occurring between August 21 and August 23, 2024 and impacting the personal information of approximately 171,000 current and former AnnieMac customers—is not the subject of any other action currently pending in any state or federal court.


Dated: November 22, 2024                    s/_____
                                            Stefanie Colella-Walsh, *Esq.*